# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANTY KEO,<br><br>　　　　　　　Petitioner,<br><br>　vs.<br><br>LARRY SMALL, Warden,<br><br>　　　　　　　Respondent. | Civil No.　　11-2154 LAB (BLM)<br><br>**REPORT AND RECOMMENDATION RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

## I.  INTRODUCTION

Petitioner Chanty Keo, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus (Pet.) pursuant to 28 U.S.C. § 2254, challenging his convictions in San Diego County Superior Court case number SCD200761 for attempted murder, robbery, assault with a firearm, burglary, unlawfully taking a vehicle, selling a stolen vehicle, grand theft, and attempted grand theft; the charges also included various weapons allegations and allegations that the crimes were committed while Keo was out of custody on bail. Pet. at 6-10, 14-16[1]; Lodgment No. 8 at 0104-09. For the reasons set forth below, the Court recommends the Petition be **DENIED**.

/ / /

/ / /

---

[1] For ease of reference, the Court will use the page numbers assigned by the Court's electronic filing system.

## II. FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1) (West 2006); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following statement of facts is taken from the California Court of Appeal's opinion denying Keo's direct appeal of his convictions:

> Because Keo does not challenge the sufficiency of the evidence to support his convictions, we summarize the facts presented at trial. Such facts in the prosecution case showed that Keo had first met Iraj Abdy in 2004 at a wrecking yard in Chula Vista. At that time, Abdy had explained to Keo that he bought cars and car parts for resale from businesses on El Cajon Boulevard in San Diego, often finding missing parts for cars at the Chula Vista junkyards. When Keo told Abdy he had some racing cars to sell, Abdy gave him the address of his business, Crown Auto Sales, at 3601 El Cajon Boulevard. Subsequently, Keo came with potential customers to that business, which Abdy then owned with George Hirad, who owned another used car business, also named Crown Auto Sales, down the street at 3470 El Cajon Boulevard. Abdy estimated that Keo had come by his El Cajon Boulevard business seven or eight times to see him before Abdy left in August 2005 to start his own used car business, Max Auto Sales, on Jamacha Boulevard in Spring Valley. At that time, Hirad continued to own and sell used cars from both businesses on El Cajon Boulevard and a salesman named Esmaeil Taghavi continued to work at the Crown Auto Sales at 3470 El Cajon Boulevard.
>
> On July 24, 2006, Keo came to see Abdy at Max Auto Sales in a red Honda Accord, driven by another Asian man, which he tried to sell to Abdy. When Abdy declined to buy the car, Keo pleaded with him to buy some wheel rims because he needed money and Abdy agreed to buy them for $250. As Abdy went into his small office where a customer named James Miller was filling out a contract for a car he was purchasing to write a check, Keo followed him and said he wanted cash. Having $2,000 in cash, which included five or six $100 dollar bills and the rest in 20's, from the proceeds of a car he had sold the previous night inside his checkbook, Abdy opened it in front of Keo and handed him $250.
>
> Keo left, but then returned to the office five to 10 minutes later with a $100 dollar bill in his hand and asked Abdy, who was still assisting Miller with paperwork regarding the car he was purchasing, for some smaller bills. When Abdy told Keo to go to a liquor store across the street for change, Keo insisted Abdy had cash on hand and would leave if he made change for him. As Abdy, who was sitting behind his desk, started to take the money out of his checkbook, Keo suddenly tried to grab the checkbook from him, but Abdy pulled it back. Keo then pulled out a handgun, pointed it at Abdy, said, "Give me the money," and fired a shot into the wall behind Abdy's chair.

At that point, Miller ran out of the office, and Abdy got up and started toward the corner of his desk. As he did so, Keo rushed toward Abdy, saying, "Give me the fucking money. I'll kill you." Keo then fired another shot at the desk and Abdy gave him the money. After obtaining the money, Keo, who was about a foot away from Abdy, continued to point the gun at him, holding it over his head with the barrel pointed downward toward Abdy. Thinking Keo was going to shoot him, Abdy tried to grab the gun and Keo fired a third shot, hitting Abdy in the upper leg. Abdy then pushed Keo out of his office and fell to the floor. Keo left the business in the Honda.

Police responded immediately to the scene of the shooting. A man working across the street from the business had seen a young Asian male with about two inches of "black hair ... spiked up" drive away in a red Honda after he heard shots coming from the business. Before Abdy was taken to a hospital where he underwent emergency surgery to insert a 38-centimeter rod with screws into his right femur, which had been shattered by the shot in his upper leg near his femoral artery, he gave a brief description of his assailant to a San Diego County Sheriff's deputy. The deputy noted that Abdy, who was in a lot of pain, described the man who robbed and shot him as an "Asian male, about 20 to 22 years old and had spiked hair, was wearing a gray shirt and blue pants." Abdy described the driver of the Honda with his assailant as Asian with hair about one inch long.

Although Abdy was initially hospitalized for two weeks, the doctors were not able to remove the bullet until four months later. When Abdy was interviewed in the hospital by investigators, he said he knew the shooter, but only by the name of Barns, or possibly Saki.

Abdy's former business partner Hirad and salesman Taghavi from Crown Auto Sales visited Abdy in the hospital the day after he was injured. At that time, Abdy told Hirad that the shooter was the man Hirad had warned him not to buy car parts from when they were partners at Crown Auto Sales. When Hirad and Taghavi told Abdy that they had bought a Honda Civic from the same man, Abdy said that the man had offered to sell the Honda Civic to him as well, but he had declined. Taghavi also told Abdy that on July 22, 2006, two days before the shooting, the same man had stopped by the Crown Auto Sales where he worked and had wanted to sell some rims and had also asked for change for a $100 bill. After the visit, Abdy told investigators that they should talk to Hirad and Taghavi.

When investigators went to Hirad's business, they discovered a green Honda on the lot that Hirad had bought from a woman accompanied by Keo on June 27, 2006, and determined it was the same car earlier reported stolen by a woman named Sara Johnson. Investigators further learned that Keo and the woman also had tried to sell the stolen Honda to Taghavi at the other Crown Auto Sales lot on June 25, 2006, and that Keo had again appeared to sell car parts at that lot on July 22, 2006. Both Hirad and Taghavi had had previous dealings with Keo at the Crown Auto Sales lots because of his acquaintanceship with Abdy, and Taghavi knew Keo as "Burns."

Much of the above information was included in the reports provided to San Diego County Sheriff's Investigator Jerry Hartman, who compiled a six-pack photographic line-up that included a photo of Keo. Hartman included Keo's photo because it fit the physical description of the man who shot Abdy, he knew Keo's nickname was Burns, which was similar to "Barns" given by Abdy, and he

was aware of Keo's involvement in the fraudulent sale of the green Honda with a woman named Rita Wages, whom Hartman had recognized in a photograph on the fake driver's license that had been given to Hirad during that sale and which Hirad had photocopied and given to the police during the stolen car investigation.

When police showed Abdy the photographic line-up, he identified Keo, who was in photograph number four, as his assailant. When Hirad and Taghavi were separately shown the same photographic line-up, each identified the photograph of Keo as the man who had been involved in the various incidents at their respective used car businesses. Keo was subsequently charged with the crimes in the instant case.

At trial, in addition to the above facts, the following evidence was presented in the prosecution case. Abdy testified he was 100 percent sure of his identification of Keo as his shooter and robber in the photographic line-up. He also identified Keo in court, and had done so at the preliminary hearing in this case. Abdy said that Keo had gained weight and his hair was a little longer than it had been on the day of the shooting. He explained that although he had said that Keo was bald then, he was not totally bald on July 24, 2006, but his hair had been very short. Abdy also said that Keo had the same facial hair at trial as he did at the time of the shooting, "a little mustache and beard." Abdy denied telling the police he did not know his assailant, only that he did not know his real name, knowing him by the name "Barns." He later learned the nickname had not been Barns, but Burns.

When asked on cross-examination if he had initially described the man who shot him as having spiked hair, Abdy responded, "What is meaning, 'spite hair'?" He then said he did not remember saying the shooter had spiked hair. Although Abdy agreed that Keo usually was always "bald," he said he had very short hair at the time of the shooting and that he knew him as the man who sold rims and a Honda to him.

Abdy testified that when he was questioned by investigators after the shooting, he had forgotten to tell them that he once bought some wheel rims from Keo and had partially paid him with a check. Shortly before trial, he remembered the incident where he bought four Lexus rims from Keo for $450, giving him $120 in cash and paying the balance with a check for $330, made out to "Chanty Keo," the name Keo had told him to write. A copy of the check was entered into evidence.

James Miller, the customer who had been with Abdy in his office the day of the shooting, also testified at trial. Miller had not paid much attention to Keo until he and Abdy were both grabbing at something and the first shot was fired. After ducking and running out of the office, Miller heard two more shots. Although Miller had not been able to identify anyone in the photographic line-up, he thought the shooter could have been in either photograph three or four, and leaned toward number four as the man who shot Abdy. Miller identified Keo as the shooter in court, as well as having done so at the preliminary hearing.

On cross-examination, Miller explained that he had only glanced at the shooter, not paying attention to his hair, but rather his facial features, which were a mix of Oriental and Black looks. He did not remember any facial hair or spiky hair, only a long flat-top type haircut.

Taghavi testified at trial about the encounter he had with Keo on July 22, 2006, two days before Abdy was robbed and shot, and also about the earlier attempted sale of the stolen green Honda on June 25, 2006. Taghavi had seen Keo at Crown Auto Sales on other occasions, but he had not known his name. As to the later July incident, Keo had entered Taghavi's office just before closing, telling Taghavi that a friend of his had a car he wanted to sell and he had some rims to sell for $100. When Taghavi asked him where the car was, Keo said his friend had driven it around the block. In response to Taghavi's refusal to buy the rims, Keo then asked him for $100. When Taghavi told him he did not have $100, Keo asked Taghavi to give him change for a $100 dollar bill and a ride two blocks down the street. Because Keo's changing stories made Taghavi feel uncomfortable, Taghavi told Keo he could not give him any change or a ride. Taghavi never saw a car or another person during the incident and, as he was driving away after he left work, he saw Keo walking toward 36th Street.

As to the earlier incident on June 25, 2006, Keo had arrived at Crown Auto Sales with a woman in a green Honda Civic, telling Taghavi that the woman wanted to sell her car. Taghavi declined to buy the car, but told them to talk to his boss, Hirad, at the other Crown Auto Sales lot down the street.

Hirad testified at trial that on June 27, 2006, Keo, whom he recognized from earlier visits to his business, and the woman came to his other lot on El Cajon Boulevard and he agreed to buy the green Honda Civic for either $2,200 or $2,700, but he then sent them back to the lot where Taghavi was working to be paid because Taghavi had the checkbook for the businesses. However, when Keo and Taghavi could not agree on the method of payment, with Keo insisting that payment be in cash, Taghavi sent Keo and the woman back to Hirad. At that time, Hirad made a photocopy of the woman's driver's license and checked the car registration and VIN number. Because everything appeared to be in order, Hirad wrote a check out to "Sara Beth Johnson," the name on the driver's license. He then accompanied Keo and the woman to the bank where the check was cashed and Hirad handed the woman the money.

Hirad further testified that when he had been business partners with Abdy he had seen Keo several times at the business selling car parts to Abdy. At that time Hirad had warned Abdy not to deal with Keo because there was no way to be sure that the parts had not been stolen.

With regard to the June 2006 incident, Sara Johnson testified that she had left her green, 1996 Honda Civic, with its title papers in the glove compartment, parked near a friend's house in Mission Hills on June 22, 2006, while she was out of town for a few days. When she returned four days later, she discovered the Honda was missing and reported its theft to the police. Johnson had taken her car keys with her and no one had permission to drive her car while she was gone. When shown the photocopy taken by Hirad of the driver's license that bore her name during the sale at Crown Auto Sales, Johnson denied that the photograph on the license was of her.

A woman named Christine Opel testified at trial that she had met Keo, whom she had known only as Burns, through her good friend, Rita Wages, who was originally charged along with Keo for the June 2006 burglary of Crown Auto Sales. [footnote omitted.] Opel had seen a fake ID Wages had had in the name of Sara Johnson. Opel was positive that Keo knew Wages was not named Sara Johnson because she had heard Keo call Wages by her real name on several

occasions. Opel identified Wages as the woman in the photograph on the photocopied driver's license bearing the name of Sara Johnson in evidence.

Although Wages was charged as a codefendant in the count 8 burglary in this case, she was not tried with Keo.

The Defense Case

The sole defense witness was a bail bondsman who identified a photograph he had taken of Keo on July 19, 2006, six days before the shooting incident. Keo's defense counsel used the photograph in closing to argue that Keo had been bald and had had facial hair at the time of the July 25, 2006 robbery and attempted murder, while the witnesses had described the shooter in that incident as a man with short or spiky hair on his head, and with little or no facial hair. Although counsel conceded that Keo had been at the dealership that day with another man to sell some auto parts, he asserted that Keo had been wrongly identified as the shooter who later returned to the dealership for change for the $100 bill.

Lodgment No. 3 at 3-11.

### III. PROCEDURAL BACKGROUND

On September 19, 2006, the San Diego County District Attorney's Office filed an Information charging Chanty Keo with attempted murder (count one), robbery (count two), two counts of burglary (counts four, and eight), assault with a firearm (count three), unlawfully taking a vehicle (count five), selling a stolen car (count six), grand theft of personal property (count seven) and attempted grand theft of personal property (count nine). Lodgment No. 8 at 0001-05. As to counts one and two, the information alleged Keo had intentionally and personally discharged a firearm which caused injury, within the meaning of Penal Code § 12022.53(d). Id. at 0001-02. As to all nine counts, the information alleged Keo had committed his crimes while out of custody on bail, within the meaning of Penal Code § 12022.1(b). Id. at 0001-05.

Following a jury trial, Keo was convicted of all counts and the jury found all the weapons and bail enhancements to be true. Id. at 0104-11. Keo was sentenced to life with the possibility of parole for count one, twenty-five years to life for the Penal Code § 12022.53(d) enhancement, and two years for the Penal Code § 12022.1 enhancement. Id. at 0145-48; Lodgment No. 3 at 2.

/ / /

1    Keo appealed his conviction to the California Court of Appeal, Fourth Appellate District,
2 Division One. Lodgment No. 4. The appellate court affirmed his convictions and sentence in
3 a written, unpublished opinion. Lodgment No. 3. Keo then filed a Petition for Review in the
4 California Supreme Court. Lodgment No. 2. The California Supreme Court denied the petition
5 without citation of authority. Lodgment No. 1.

6    Keo filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 in this Court on
7 September 16, 2011. ECF No. 1. Respondent filed an Answer and Memorandum of Points
8 and Authorities in Support of the Answer on February 13, 2012. ECF No. 13. Keo filed a
9 Traverse on March 15, 2012. ECF No. 15.

**IV.   DISCUSSION**

   A.   Standard of Review

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); Early v. Packer, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. See Yarborough v. Gentry, 540 U.S. 1, 4 (2003); Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. See Bell v. Cone, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal

principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. Id. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." See Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. See Ylst v. Nunnemaker, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Andrade, 538 U.S. at 75-76); accord Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. See Early, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. Id. Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." Andrade, 538 U.S. at 72.

B. Analysis

Respondent contends the petition was filed beyond the one year statute of limitations imposed on federal habeas corpus petitions. See 28 U.S.C. § 2244(d); Answer at 2, ECF No. 15; Mem. of P. & A. Supp. Answer at 21-22. In the alternative, Respondent argues the state court's resolution of Keos' claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Mem. of P. & A. Supp. Pet. at 15-21, ECF No. 1.

/ / /

/ / /

1. Timeliness

Respondent contends the petition was filed beyond the one year statute of limitations established by 28 U.S.C. § 2244(d). Mem. of P. & A. Supp. Answer at 12-18, ECF No. 12. Under 28 U.S.C. § 2244(d), a petitioner has one year from the date his or her conviction is final to file a petition for writ of habeas corpus in federal court pursuant to 28 U.S.C. § 2254. See 28 U.S.C. § 2244(d) (West 2011). The statute of limitations, however, is subject to both statutory and equitable tolling. See 28 U.S.C. § 2244(d)(1); Holland v. Florida, __ U.S. __, 130 S.Ct. 2549, 2560 (2010).

Keo's direct appeal concluded on October 28, 2008 when his petition for review was denied. See Lodgment No. 1. His conviction therefore became final ninety days later, on January 26, 2009, and the one year statute of limitations began running the next day. See Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 1999). Absent any statutory or equitable tolling, Keo had until January 26, 2010, to file his federal habeas petition. 28 U.S.C. § 2244(d); Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001) (applying Federal Rule of Civil Procedure 6(a), which states "[i]n computing any period of time prescribed . . . by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included" to AEDPA). He did not do so until September 15, 2011. The petition is therefore untimely unless Keo is entitled to enough statutory and/or equitable tolling to make the petition timely.

a. Statutory Tolling

28 U.S.C. § 2244(d)(2) provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review . . . is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). Keo did not file any "application[s] for State post-conviction or other collateral review" and thus he is not entitled to any statutory tolling.

b. Equitable Tolling

AEDPA's statute of limitations is subject to equitable tolling. Holland, 130 S. Ct. at 2560. "To be entitled to equitable tolling, [Petitioner] must show, '(1) that he has been

pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented him from filing." Lawrence v. Florida, 549 U.S. 327, 336-37 (2007), quoting Pace, 544 U.S. at 418. Equitable tolling is unavailable in most cases, and "the threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule." Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002).

As noted above, Keo's petition was due on or before January 26, 2010. Keo claims he sent a habeas corpus petition to this Court on October 4, 2009, well within § 2244(d)'s statute of limitations. See Pet. at 16-19, ECF No. 1. When he did not receive any response from the Court, he sent a letter inquiring about his petition on August 4, 2011. Pet. at 16-17, ECF No. 1. The Court informed him that there was no record of his petition having been received. Pet. at 20. Keo then filed the instant petition on September 15, 2011.

Assuming Keo's version of events is accurate, 250 days had passed between when the statute of limitations began to run on January 27, 2009, and when he claims, under penalty of perjury, he mailed his first petition to the Court on October 4, 2009. If true, Keo would be entitled to equitable tolling for the time period between when he mailed his first petition, October 4, 2009, and when he was notified the petition had presumably been lost and not filed, August 12, 2011. See Corjasso v. Ayers, 278 F.3d 874 (9th Cir. 2002) (Petitioner entitled to equitable tolling for the period of delay caused by the extraordinary circumstances of the district court erroneously dismissing a petition and losing the petition). Beginning on August 13, 2011, the statute of limitations began running again, and there were 115 days remaining within which Keo could file his federal petition. His petition was therefore due by December 6, 2011, and he filed the instant petition on September 15, 2011. Under this scenario, his petition is timely.

The mail log provided by Keo, however, indicates the only time documents were sent to this Court was on June 3, 2010.[2] According to Keo, this was a "request for acknowledgment

---

[2] By this time, however, the statute of limitations had run and the filing therefore has no effect on any possible equitable tolling to which Keo may be entitled.

of receipt of [his] petition." Pet. at 16, ECF No. 1. If the mail log is correct, no outgoing mail was sent on or near October 4, 2009. If these facts are accurate, the statute of limitations expired on January 26, 2010 and Keo's September 15, 2011 petition would be untimely.

Because the parties briefed the merits of the petition, the Court finds it unnecessary to resolve this factual dispute governing the timeliness argument and will address the merits of Keo's claims.

### 2. Due Process Rights and the Pretrial Lineup

Keo contends the pretrial lineup shown to witnesses by police was unduly suggestive because it was constructed with individuals who looked similar to him rather than with individuals who looked similar to descriptions of the assailant given by witnesses. Pet. at 6-7. He also contends the other individuals in the lineup did not match his appearance "in all significant aspects." Id. at 7. Respondent argues the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Mem. of P. & A. Supp. Answer at 17-19.

Keo raised this claim on direct appeal in the petition for review he filed in the California Supreme Court. Lodgment No. 2. Because that court issued a summary denial of the claim, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. Ylst, 501 U.S. at 805-06. That court wrote:

> Initially, we note that the record is not totally clear as to the court's in limine ruling. Even though the prosecutor argued that defense counsel was not raising any issue as to whether the eyewitness testimony should be excluded as tainted by the purported suggestive lineup as compared to only suppressing the photographic lineup shown the witnesses, the court's ruling appears to have impliedly found that the photographic lineup was not suggestive and that all testimony regarding such lineup would be admitted. However, because defense counsel had narrowed the motion during argument below to apply only with regard to Abdy's identification of him as the robber and shooter, Keo's appellate assertions, which generally refer to all the eyewitness testimony and the identifications of him made by various other witnesses who were shown the photographic lineup before trial are waived. (Evid. Code, § 353.) As to Keo's due process claims regarding the photographic lineup and Abdy's in-court identification testimony, on this record, we conclude they lack merit.
>
> "Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable. [Citations.]" (People v. Yeoman (2003) 31 Cal.4th 93, 123.) The defendant bears the burden of showing the

identification procedure used in any case was suggestive and unreliable. (People v. DeSantis (1992) 2 Cal.4th 1198, 1222.) "'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation]. If, and only if, the answer to the first question is yes and the answer to the second question is no, is the identification constitutionally unreliable.' [Citation.] In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (People v. Ochoa (1998) 19 Cal.4th 353, 412 (Ochoa).)

To evaluate suggestiveness in a witness identification procedure, the above factors are considered to determine "'[t]he question [of] whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (People v. Cunningham (2001) 25 Cal.4th 926, 990 (Cunningham); see also People v. Kennedy (2005) 36 Cal.4th 595, 610.) Although our review is deferential to the trial court's findings of fact which involve credibility determinations, we independently review the trial court's ruling "that a pretrial identification procedure was not unduly suggestive." (Id. at p. 609.)

After independently reviewing the subject photographic lineup, which was entered into evidence as People's Exhibit No. 11 and contained the photographs of Keo and five other men, we agree with the trial court's implied finding that the photographic lineup was not suggestive. All the photos in the lineup were Asian males of similar age and build, and the backgrounds of the photographs were all similar. Although four of the men had longer hair than the close buzz cut in Keo's photograph, the sixth man had a close buzz cut like Keo's. Two of the other men also had facial hair similar to that depicted in Keo's photograph. Although not all of the people in the lineup looked like Keo in "all significant aspects" as he claims, there is simply no requirement that only perfect matches or "very similar" individuals be placed in a lineup. Rather, the critical point is that the suspect not be included in the lineup in such a manner as to make his identification a virtual certainty. (See Cunningham, supra, 25 Cal.4th at p. 990.) Nothing about the composition of the photographic lineup impermissibly singled our Keo as the suspect in the crimes.

Moreover, Keo was afforded an opportunity at trial to attack the manner in which the photographic lineup was assembled and conducted. "'Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification including reference to . . . any suggestibility in the identification procedure. . . .' [Citation.]" (Manson v. Brathwaite (1977) 432 U. S. 98, 113-114, fn. 14.) Keo's counsel cross-examined Detective Hartman in detail regarding the manner of selecting the individual photographs for the lineup and argued in closing that Abdy's identification of the shooter was invalid because he had initially told the police that his assailant had spiky hair while none of the photos in the lineup showed a man with spiky hair. Counsel essentially argued that the victim Abdy had identified Keo's photograph in the lineup solely because he knew him from earlier dealings.

> Contrary to Keo's continual reliance on the argument that his photograph depicting him as bald or with a short buzz cut should not have been included in the lineup because it did not fit Abdy's initial description of the suspect and therefore suggests the lineup "was constructed to match [his] pre-robbery description rather than that of the spikey-haired robber," the facts demonstrate that there were legitimate reasons to include his photograph in the lineup because of additional information about Keo's nickname obtained from Abdy and other witnesses during the criminal investigation. Keo's argument went to the weight of the evidence and not its admissibility. The jury was free to consider any inconsistencies in Abdy's and the other witnesses various identifications and descriptions of the suspect given to police just after the robbery and shooting when deciding what weight to afford the evidence.
>
> Because we have determined that Keo has failed to show that the photographic lineup was unduly suggestive, we need not consider whether Abdy's identifications of him were otherwise reliable. (Ochoa, supra, 19 Cal.4th at pp. 412-413.) Accordingly, we conclude on this record that the trial court properly denied Keo's motion to exclude evidence about the photographic lineup at trial.

Lodgment No. 3 at 13-17.

The first question the Court must confront is whether the identification process used by Detective Hartman was "unduly suggestive." The California law applied by the state appellate court to Keo's claim is consistent with clearly established Supreme Court law on the issue of eyewitness identification evidence. "An identification procedure is suggestive when it 'emphasize[s] the focus upon a single individual' thereby increasing the likelihood of misidentification. [United States v.] Bagley, 772 F.2d [482, 492 (9th Cir.1985)] ("The repeated showing of the picture of an individual, for example, reinforces the image of the photograph in the mind of the viewer."); Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)." United States v. Montgomery, 150 F.3d 983, 992 (9th Cir. 1998). Detective Hartman testified that he put the photographic lineup together after speaking to Abdy and Taghavi. Lodgment No. 9, vol. 2 at 314. Abdy gave him a possible nickname of "Saki" or "Barns" or "Burns" for the person who robbed and shot him. Id. at 321, 353-54. Using this information and the general description of an Asian male with short hair, Hartman asked other law enforcement officials if the description and nickname matched anyone they were familiar with and searched law enforcement databases. Id. at 321, 327. Hartman then took the general description and entered the information into a database used to prepare photo lineups. Id. at 328. Hartman chose photographs to include in the lineup from those generated by the

database. Id. at 328-29. When asked how and why he included Keo in the lineup, he responded as follows:

> [DET. HARTMAN]: Okay. The first person I developed I found out was in the Department of Corrections custody. Therefore, he was eliminated as a suspect. When I ran that individual I found he had a law enforcement contact with another Asian male and a female by the name of Rita Wages. I was already familiar with Rita Wages — well, I was familiar that there was a female that was involved in the selling of a stolen car to Mr. Taghavi and Mr. Hirad.
>
> So I had in my possession a copy of the driver's license that was used to make that sale and I realized that the pictures matched, Rita Wages and this individual. I did an inquiry on Ms. Wages, or Rita Wages, and found out that she had currently — she had been incarcerated the beginning of July, and when she was arrested she was with two other individuals, one being a Sareang Ye and one being your client.
>
> I ran an inquiry — actually, there was three or four other individuals arrested in that case. I ran them. I found out two were currently out on bond, one of which was your client, and therefore I put him in the lineup.

Id. at 331.

Hartman also testified that the purpose of a lineup is "[t]o show an objective series of photographs to a witness or victim . . . to potentially identify a suspect," that "[a] lineup should never be done to focus the attention of the lineup on a particular individual," and that "[i]t should be indifferent, basically each picture being somewhat different than the others, or all of them similar." Id. at 335. In this case, Hartman said, he wanted the photographs to have some variation, partly because Abdy first said the attacker had his hair in a ponytail and others described the attacker as having short, spiky hair. Id. Two people in the lineup, including Keo, had short hair and the others had longer hair, including one person with a ponytail. Id. at 338-39. The appellate court's independent review of the photographic lineup confirmed that the individuals pictured were all Asian males of similar age, build and with similar backgrounds, and that two individuals had short hair while four had longer hair. Lodgment No. 3 at 15.

Based on Hartman's testimony and the state appellate court's independent evaluation of the lineup, there is insufficient evidence in the record to support a conclusion by this Court that the lineup used in Keo's case was suggestive. There is nothing in the record that shows Keo's photograph was highlighted in any way, that his appearance was so markedly different from the other individuals in the lineup that the witnesses who were shown the lineup were

more likely to choose Keo, or that an emphasis was focused on Keo's image such that a witness would be likely to misidentify him. See Bagley, 772 F.2d at 492.

Moreover, as the state court correctly noted, even if the identification procedure was suggestive, the identification was not automatically excludable. In Neil v. Biggers, 409 U.S. 188, 198-99 (1972), the Supreme Court held a suggestive identification need not be excluded if, "under the 'totality of the circumstances,' the identification was reliable." Id. at 199; see also Manson v. Brathwaite, 432 U.S. 98 (1977). In determining reliability, the question is whether the identification gives rise to "a very substantial likelihood" of misidentification. Biggers, 409 U.S. at 198; Simmons v. United States, 390 U.S. 377, 384 (1968). The Supreme Court recently noted as follows:

> Instead of mandating a per se exclusionary rule, the Court [has] held that the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification." Biggers, 409 U.S., at 201 [citation omitted]. "[R]eliability [of the eyewitness identification] is the linchpin" of that evaluation, the Court stated in Brathwaite. Id., at 111 [citation omitted.] Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. Id., at 114 [citation omitted.] Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury.

Perry v. New Hampshire, ___ U.S. ___, 132 S.Ct. 716, 724 (2012).

Factors which should be considered in determining whether an identification is accurate are: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation." Manson, 432 U.S. at 114 (1977).

In Keo's case, the Manson factors weigh in favor of the admission of Abdy's identification, as the state court correctly concluded. Abdy had a very good opportunity to view the individual at the time of the crime. He had a face-to-face conversation with him for several minutes and spoke to him twice within a period of ten minutes. Lodgment No. 9, vol. 1 at 68-70, 73-89. The evidence also supports a conclusion that Abdy was paying close attention to the individual because he was negotiating the purchase of wheel rims and because

the individual tried to grab the checkbook containing Abdy's money then shot Abdy when he resisted. Id. at 73-88.

Abdy's description of the individual, however, was not particularly consistent. While he testified at trial that he knew Keo from prior interactions, that Keo was the person who robbed and shot him, and that the individual who robbed him was bald and had a small mustache and beard, he first told police that he did not know who shot him and that the individual had spiked hair or hair in a pony tail and no facial hair. Lodgment No. 9, vol. 1 at 119, vol. 2 at 301, 322-31. Abdy also admitted he discussed the description of the robber with Esmaeil Taghavi and George Hirad, who had also had business dealings with Keo. Lodgment No. 9, vol. 1 at 125-26. Abdy told Hirad that the robber was the person with whom Hirad had warned Abdy not to do business. Lodgment No. 9, vol. 2 at 246. All agreed that the robber was Keo. Lodgment No. 9, vol. 1 at 125-26; Lodgment No. 9, vol. 2 at 200-01, 204. Indeed, it was this difference between Abdy's description of the robber and Keo's actual appearance as well as his discussion with Taghavi and Hirad about Keo being the robber that formed the basis of the defense contention that Abdy identified Keo as the robber only because he was a familiar face. Abdy testified, however, that he was 100% certain that Keo was the individual who robbed and shot him. Lodgment No. 9, vol. 1 at 99. Moreover, Abdy explained that he did not tell the officer that he did not know the assailant; he said he did not know the assailant's name. Id. at 126, 129. Finally, Abdy identified Keo in the lineup within three weeks of the incident. Lodgment No. 9, vol. 2 at 316. In sum, Abdy's identification of Keo had sufficient indicators of reliability such that, even if the product of a suggestive, lineup, it should not have been excluded.

As to Taghavi and Hirad, both of whom identified Keo in the photographic lineup as the person who sold them the stolen car, the Manson factors also weigh in favor of admission. Taghavi and Hirad both had a very good opportunity to view the individual at the time of the crime, having had face-to-face conversations with him on several occasions. Lodgment No. 9, vol. 1 at 159-69, vol. 2 at 223-35. In fact, Hirad drove to the bank with the individual who sold him the stolen car. Lodgment No. 9, vol. 2 at 235-36. The evidence also supports a

conclusion that Taghavi and Hirad were paying close attention to the individual because they were negotiating the purchase of a car over a substantial period of time. The negotiations took some time because Hirad had to check the VIN number, the title papers and the driver's license of the woman (Rita Wages, impersonating Sara Beth Johnson, the actual owner) who was supposedly selling the car, the individual did not want to accept a check, and arrangements had to be made to secure cash. Id. at 231-36.

Taghavi and Hirad testified at trial that they knew Keo from prior interactions, but did not specifically give a description of the individual who sold them the stolen car, primarily because the illegality of the sale did not come to light until Abdy was shot. Lodgment No. 9, vol. 1 at 169-71, vol. 2 at 255. Both Taghavi and Hirad identified Keo in the lineup within two weeks of the incident. Lodgment No. 9, vol. 1 at 158-60, vol. 2 at 225-26316. In sum, Taghavi's and Hirad's identification of Keo also had sufficient indicators of reliability such that, even if the product of a suggestive, lineup, they should not have been excluded. See Perry, 132 S.Ct. at 724.

For all the foregoing reasons, this Court cannot conclude the state court's rejection of Keo's claim was contrary to, or an unreasonable application of, clearly established Supreme Court law. Williams, 529 U.S. at 412-13. For the foregoing reasons, this Court **RECOMMENDS** that Petitioner's Petition be **DENIED** on ground one.

### 3. Ineffective Assistance of Counsel

Keo contends his trial counsel rendered ineffective assistance when she failed to present testimony by an eyewitness identification expert. Pet. at 8-10, ECF No. 1. Respondent counters that the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Mem. of P. & A. Supp. Answer at 19-21.

Keo raised this claim in the petition for review he filed in the California Supreme Court. Lodgment No. 2. The California Supreme Court summarily denied the petition. Lodgment No. 1. Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. Ylst, 501 U.S. at 805-06. That court wrote:

>On appeal, Keo contends his retained trial counsel provided ineffective assistance by failing to call an expert on eyewitness identification without explanation after alerting the court that she may do so. His claim fails on appeal.
>
>"To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (Cunningham, supra, 25 Cal.4th at p. 1003.)
>
>Further, "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (People v. Kraft (2000) 23 Cal.4th 978, 1068-1069 (Kraft); People v. Mendoza Tello (1997) 15 Cal.4th 264, 266-267 (Mendoza Tello).)
>
>Here, the record is silent on why Keo's counsel did not call an expert to testify on eyewitness identification. Because counsel was not asked for an explanation and the record fails to eliminate the possibility of a satisfactory explanation for not calling one, i.e., counsel may have made a tactical decision not to call an eyewitness expert because she thought the expert might be more helpful to the prosecution than to the defense in light of so many of the witnesses, including the shooting victim, already knew Keo before the crimes, we must reject the claim for purposes of this appeal. (Kraft, supra, 23 Cal.4th at pp. 1068-1069; Mendoza Tello, supra, 15 Cal.4th at pp. 266-267.)

Lodgment No. 3 at 17-18.

To prevail on a claim of ineffective assistance of trial counsel in federal court, Keo must first establishe that his trial counsel's performance fell below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 668, 687 (1984). "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Judicial scrutiny of counsel's performance must be "highly deferential." Id. at 689. Second, he must show that counsel's deficient performance prejudiced the defense, such that the result of the proceeding would have been different absent counsel's errors. Id. at 687. On federal habeas review, "the question is not whether counsel's actions were reasonable, [but] whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v.

Richter, __ U.S. __, 131 S. Ct. 770, 788 (2011). The Court need not address the performance prong if the claim can be resolved on the ground of lack of sufficient prejudice. Strickland, 466 U.S. at 697.

As the state court properly concluded, counsel could have made a reasonable tactical decision that calling an eyewitness identification expert would not have helped Keo's case as much as casting doubt on the witness' identification of Keo via cross examination and argument. Counsel could have reasonably feared the prosecutor would be successful in discrediting an eyewitness expert's favorable testimony because the witnesses identified someone they had seen numerous times. See Strickland, 466 U.S. at 687. As such, Petitioner has not established that counsel's performance was objectively unreasonable. In addition, Keo has not met Strickland's prejudice prong because he has not shown what the expert would have testified to and how that testimony would have changed the outcome of his trial. Id. at 689. He simply speculates that the testimony of an eyewitness identification expert would have helped his case. That is an insufficient showing to meet Strickland's prejudice standard, and the state court therefore reasonably rejected Keo's claim. See id.; Williams, 529 U.S. at 412-13. Accordingly, this Court **RECOMMENDS** that Petitioner's Petition be **DENIED** on ground two.

## V.     CONCLUSION

The Court submits this Report and Recommendation to United States District Judge Larry Alan Burns under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d)(4) of the United States District Court for the Southern District of California. For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) **DENYING** the Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than **July 16, 2012** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **July 30, 2012**. The parties are advised that

failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: June 18, 2012

*/s/ Barbara L. Major*

BARBARA L. MAJOR
United States Magistrate Judge